**Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



FILED

Jan 15 2015, 9:49 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**JOHN C. BOHDAN**
Deputy Public Defender
Fort Wayne, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**IAN McLEAN**
**CYNTHIA L. PLOUGHE**[1]
Deputy Attorneys General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| SEAN PATRICK HOGAN, | ) | |
| | ) | |
| Appellant-Defendant, | ) | |
| | ) | |
| vs. | ) | No. 02A05-1404-CR-179 |
| | ) | |
| STATE OF INDIANA, | ) | |
| | ) | |
| Appellee-Plaintiff. | ) | |

APPEAL FROM THE ALLEN SUPERIOR COURT
The Honorable John F. Surbeck, Jr., Judge
Cause No. 02D05-1309-FA-38

**January 15, 2015**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**KIRSCH, Judge**

---

[1] We note that Ms. Ploughe is not named on the Appellee's brief; however, we include her as an attorney for the Appellee because she filed an appearance and we do not see that she filed a motion to withdraw.

Following a jury trial, Sean Patrick Hogan was convicted of four counts of Class A felony child molesting,[2] four counts of Class C felony child molesting,[3] and one count of Class D felony dissemination of matter harmful to minors.[4] The trial court sentenced Hogan to the advisory sentence of thirty years for each of the Class A felony convictions, to be served consecutively. The trial court also sentenced Hogan to the advisory sentences of four years for each of the Class C felony convictions and one-and-a-half years for the Class D felony conviction, all to be served concurrently with the Class A felony sentences, for an aggregate sentence of 120 years executed. Hogan raises the following restated issues on appeal:

I.      Whether Hogan's sentence of 120 years was inappropriate in light of the nature of the offense and the character of the offender; and

II.     Whether the trial court's application of the 2008 "credit restricted felon" designation to Counts II, III, and IV violated the constitutional prohibition against ex post facto laws.

We affirm.

## FACTS AND PROCEDURAL HISTORY

A.B. was born June 15, 1999 to J.B. ("Mother") and Father. In 2001, Mother and Hogan, who was at that time approximately twenty-six years old, began dating. When A.B.

---

[2] *See* Ind. Code § 35-42-4-3(a). Counts I through VIII alleged that Hogan committed child molesting against A.B., in violation of Indiana Code section 35-42-4-3, during the time period between June 15, 2004 and May 31, 2013. Although that section was amended during that time period, the language pertinent to Hogan's convictions did not change.

[3] *See* Ind. Code § 35-42-4-3(b).

[4] *See* Ind. Code § 35-49-3-3(a). We note that, effective July 1, 2014, the statutes pertaining to child molesting and dissemination of matter harmful to minors have been amended to change felonies once categorized by "Class" to now being categorized by "Level." Hogan committed his crimes prior to July 1, 2014; therefore, we use the statutes in effect at the time he committed the offenses.

was about two-and-a-half years old, she, Mother, and Hogan began living together on Springbrook Road in Fort Wayne, Indiana. A.B. had visitation with Father on Mondays and Thursdays and every other weekend. At some point in early 2003, Hogan and Mother had a child together, C.H.

Hogan often watched A.B. and C.H. while Mother was at work. When A.B. was very young, Hogan introduced her to "the chair game," where Hogan would tie A.B. up to a computer chair "and see if [she] could get out." *Tr.* at 143. A.B. recalled, "He would just say if I could get out I could do whatever I wanted to do to him, and if I couldn't then he could do whatever he wanted to me." *Id.* at 145. Hogan always tied A.B. so securely that she couldn't escape. At first, Hogan would just tickle A.B. when she could not escape. One day, when A.B. was five years old and failed to escape, Hogan told A.B., "what he was going to do he could go to jail for so I couldn't tell anybody and that what he was going to do was going to make me feel like I had to pee." *Id.* at 144. A.B. recalled, "He put his mouth on my vagina." *Id.*

A.B. recalled that Hogan's abuse became worse as she grew older. A.B. said she "grew up thinking it was okay, that everything was okay" because Hogan "told me he was in love with me." *Id.* at 147. The first time A.B. learned that Hogan's conduct was not normal was when she was in the third or fourth grade at school and saw a video "on like how stuff wasn't okay," and saw that other people "didn't have people calling them that much" or people who were "right by their sides" as she did. *Id.* at 148, 149.

While A.B. was growing up, Hogan made her watch pornographic videos and, when A.B. was eight or nine years old, Hogan made two videos in which he made A.B. lie on

top of him while Hogan simulated having sex with her. *Id*. at 152. Hogan later made A.B. watch one of the two videos. Prior to 2010, handcuffs became a part of Hogan's "games." *Id*. at 155, 156. A.B. testified that if she did not want to do something with Hogan, he would use handcuffs to attach her to bars on the bed frame and "sometimes belts with [her] hands and [her] legs." *Id*. at 155. A.B. recalled that sometimes Hogan presented this behavior "more like it was a game" and that at other times, "it would be like, no, you have to do this." *Id*. at 156. A.B. testified that if she expressed unwillingness, Hogan "would get really mad and say I was like betraying him and stuff like that." *Id*. at 155. Hogan also would accuse A.B. of "cheating on him with somebody at [her] school." *Id*. Sometimes A.B. screamed in protest, but she said, "[I]f I put up a fight, there was just going to be more. There was just going to be a bigger fight and nothing was going to work out. Either way it was going to happen." *Id*. at 156.

In 2010, after living on Springbrook Road for eight years, Hogan, A.B., C.H., and Mother moved into a hotel for about a month and then moved into a home on Fifth Street in Fort Wayne. A.B. recalled that, when she was ten or eleven years old, Hogan "made me do stuff to him"; he made me "put my mouth on his penis," "put my hands on his penis," and "rub all over him." *Id*. at 151-52, 154. A.B. testified that while still living in Indiana, when she was younger than twelve years old, Hogan touched her "[a]ll over. My vagina, my breasts, my butt, everything." *Id*. at 163. When asked whether Hogan touched the inside or outside of her vagina, A.B. testified that Hogan used his fingers to touch her vagina "[i]n and out." *Id*. A.B. also testified that Hogan would sometimes make her stand on an exercise machine in a position that allowed him to place his mouth on her vagina.

4

On returning home from work one evening, Mother found A.B. in bed with Hogan. Hogan was cuddling A.B. and had his legs draped over her. Mother ended her relationship with Hogan and moved to Florida in May 2011, taking both A.B. and C.H. with her. A.B. was eleven when the family moved to Florida. Mother testified that, at that time, Hogan called A.B. about "35 times a day," "and he would text her all day long." *Id.* at 374. Hogan also sent frequent messages to A.B.'s Facebook page, in an effort to get her attention. *Id.*

While living in Florida, A.B. and C.H. would return to Indiana periodically to visit their respective fathers. These visits occurred during winter break in 2011, during spring break in 2012, and during the summer of 2012. When A.B. returned to Indiana for visits, she visited Hogan's house in order to see C.H. During those visits, Hogan made A.B. sleep in his bed and compelled her to engage in oral sex. One night, A.B., wanting to sleep in her sister's room, refused to sleep in Hogan's bed. At two o'clock in the morning, Hogan came into the room with "hot water and he poured it all over me, just because I didn't want to sleep in his room." *Id.* at 165. A.B. left C.H.'s room and went to sleep in Hogan's room.

During the summer of 2012, a custody battle resulted in A.B. and C.H. moving to Fort Wayne to live with their respective fathers. Thereafter, Hogan had regular contact with A.B. Father later explained that he helped Hogan get a job with Father's employer so that Hogan could "get on his feet," and he allowed Hogan to spend time with A.B. because Father thought that Hogan "always would take care of her and be there for her." *Id.* at 455, 456.

When A.B. was in middle school, Hogan would drop off and pick up A.B. from school. Hogan was listed as one of the contacts to call in case of an emergency. Hogan

5

frequently called and texted A.B. at school.  At trial, A.B.'s science teacher recalled that Hogan's constant texting and calling disrupted A.B. in school, leaving A.B. "agitated and upset."  *Id*. at 296, 298.  The science teacher also remembered that A.B. was repeatedly called out of class to speak to Hogan on the phone in the front office.  The science teacher heard some of the messages that Hogan left for A.B., "saying things that you don't say to a thirteen year old."  *Id*. at 301.  In one message, Hogan said, "[Y]ou're my baby, I can't live without you."  *Id*.

The school's principal personally recalled that Hogan called the school "[s]ometimes multiple times in a week[, s]ometimes multiple times in a day."  *Id*. at 315. The principal recalled that the volume of calls from Hogan to A.B. was unusually high and that Hogan also sent her gifts to school.  When A.B. was not at school, Hogan would constantly call or text her while she was with friends or relatives.  A.B.'s aunt went through A.B.'s cell phone and saw photographs from Hogan of girls wearing panties and short tops. In each of the photos, the girl had a pierced belly button, which A.B. said was something Hogan wanted her to get.  *Id*. at 269.

Bridgette, the mother of one of A.B.'s friends, recalled that it was "kind of creepy" how often Hogan called A.B.  *Id*. at 414.  When Bridgette told A.B. to turn off her phone, A.B. replied, "[N]o, [Hogan] will get mad, I can't."  *Id*. at 415.  When Bridgette discussed this with Hogan, he told her that A.B.'s father was the "bad dad" and that Hogan was "the good dad" who was trying "to keep [A.B.] on line."  *Id*.  Bridgette testified that Hogan was not a father figure, but, instead, "acted like a jealous boyfriend."  *Id*.

Around Christmas 2012, when A.B. was thirteen, Hogan secretly gave her a ring

and told her it was her engagement ring. *Id*. at 182. In the spring of 2013, Hogan made A.B. stay over at his house at least twice a week. *Id*. at 168. A.B. had to sleep in Hogan's bed, and he would make her perform oral sex on him. Hogan would occasionally ejaculate on her and told A.B. that it would make her skin soft. *Id*. at 170. Hogan always told A.B. that he was in love with her, and that she "had to have a baby with him by the time she was seventeen." *Id*. at 182. One night, when A.B. was thirteen years old, Hogan woke her up. *Id*. at 170-71. A.B. realized that Hogan was about to abuse her again, later explaining "after that happens for so long you just know." *Id*. at 171. Hogan disrobed and partially penetrated A.B.'s vagina with his penis. *Id*. A.B. felt pain and screamed, and Hogan rose and left the room. *Id*. C.H. was downstairs playing a video game. *Id*. at 172. C.H. responded to A.B.'s scream, asking what was wrong, but A.B. told C.H. that she had merely stubbed her toe. *Id*.

A.B. recalled that she took pains to hide from C.H. what Hogan was doing because Hogan was C.H.'s dad, and since Mother "was not a very good mom," A B. said that she had "practically raised [her] sister." *Id*. at 172-73. A.B. did not tell Mother about the abuse because she did not trust her. *Id*. at 174. Additionally, A.B. was coerced into silence by Hogan's threats, recalling that "[Hogan] always told me that he would kill my dad, he would send me back to Florida with my mom . . . ." *Id*. at 175. A.B. was frightened for Father, later saying, "I love my dad with all my heart. He's the only person . . . if I didn't have him I would be in like foster care right now." *Id*. at 176. A.B. was also afraid of returning to Florida, saying, "[M]y mom was a really bad mom. She was an abuser. She wasn't a mom to me at all." *Id*. Hogan also promised A.B. that if she told anyone what he

7

was doing, "he would make it look like I did it, like it was my fault." *Id*. at 174-75.

A.B. eventually told her guidance counselor, explaining, "I was just fed up with everything, I couldn't take it anymore, I couldn't take him calling me so many times, I couldn't take not being able to live a life as a teenager." *Id*. at 175. The guidance counselor notified Child Protective Services, A.B.'s principal, and Father. *Id*. at 277, 278. A.B. showed her guidance counselor photographs on her cell phone that Hogan had sent her, one of which appeared to be an erect penis, covered by underwear. Meanwhile, Hogan called the school, and the principal told Hogan that he was no longer on A.B.'s contact list. *Id*. at 317. Hogan then called A.B.'s cell phone. A police officer took the call and told Hogan not to call again.

Detective Bridget Glaser of the Fort Wayne Police Department interviewed Hogan and, later, retrieved Hogan's cell phone from his vehicle with Hogan's consent. Hogan's cell phone was in four pieces—the "flip phone" itself was in two pieces and the battery and SIM card had both been removed. *Id*. at 537. Forensic examination of Hogan's cell phone revealed that approximately 4,000 images had been deleted from the phone's memory. *Id*. at 512.

Hogan was charged with four counts of Class A felony child molesting, four counts of Class C felony child molesting, and one count of Class D felony dissemination of matter harmful to minors. The offenses were alleged to have occurred "[s]ometime during the period of time between the 15th day of June, 2004 and the 31st day of May, 2013." *Appellant's App.* at 15-23. A partial log of A.B.'s text messages was introduced at Hogan's trial. That log revealed dozens of text messages sent from Hogan to A.B. On May 11,

2013, Hogan had texted A.B. twenty-five times, sending messages like, "Where is my pic," "You have 2 min to call me or i call your teacher," and "Dumb ass." *State's Ex*. 7. On May 25, 2013, Hogan texted A.B. thirty-six times within seven minutes with the one-word message, "Hello." *Id*. Another message Hogan texted on this day was, "When you get ready for bed i come get you:)." *Id*. On May 30, 2013, the day A.B. reported the abuse, Hogan texted "See you in court" seven times within eleven minutes. *Id*. The following day, Hogan texted A.B. twice within five seconds, saying each time, "I called the police on your dad." *Id*. A search of Hogan's residence, pursuant to a warrant, uncovered a handcuff key. *Tr*. at 539. A jury convicted Hogan of all nine counts.

At sentencing, the trial court found mitigating significance in Hogan's lack of a criminal history, his community involvement, and expressions of support from community members. *Sentencing Tr*. at 15. The trial court then turned to aggravating circumstances:

> The first being the violation of trust. You were in the position of a parent, father of this child from the time she was very young and therefore had a substantial amount of influence over her and what she did and you used that to commit these atrocious offenses against this child. Furthermore, this conduct went on for a very, very long time. . . . It went on from the time as noted, from the time she was five until she was thirteen, which is extraordinary.

*Id*. at 16. The trial court also recognized that the manner by which the crimes were committed changed in relation to A.B.'s age. At first A.B. was young and trusted Hogan so he committed the crimes by means of persuasion, but later when A.B. was older and knew Hogan's actions were wrong, he committed the crimes by force. The trial court understood that Hogan's family and friends will suffer hardship, yet, noted that it was Hogan who imposed that suffering just as he imposed it on A.B. *Id*. at 17. The trial court

9

determined there were "significant aggravating circumstances, any one of which outweigh[ed] the totality of the mitigating circumstances." *Id*. at 16.

The State argued, in part, that the Class A felony sentences should be served consecutively to each other because Hogan committed his crimes over a significant period of time. *Id.* at 13-14. The trial court agreed, stating:

> There are in fact, again as noted by the prosecuting attorney, there are four separate kinds of conduct.[5] Each of which was imposed repeatedly on this child with the exception . . . my understanding of the testimony was that there was a single instance of intercourse. Beyond that, the other kinds of conduct were imposed repeatedly on this child. Any one of which items of conduct, had this only occurred once with each class of offense if you will, are punishable by the advisory term, these are Class A felonies. In the meantime, with the exception as I say of the intercourse, the other three were repeated over and over. And so I don't have any problem ordering Defendant committed to the Indiana Department of Correction . . . for the advisory term of thirty years. Those being separate and distinct types of conduct that were repeated, with the exception of the intercourse, that were repeated over and over again for a period of eight years, I'm going to order that those terms be served consecutively [to] one another for a total term of 120 years.

*Id*. at 18-19. The trial court also imposed advisory sentences of four years for each of the Class C felony child molesting convictions, and an advisory sentence of one and one-half years for the conviction for Class D felony dissemination of matter harmful to minors. *Id*. at 20. The trial court ordered these latter five sentences to be served concurrently with the sentences for Hogan's Class A felonies, for an aggregate sentence of 120 years. *Id*. at 19-21.

The State also requested a finding that Hogan was a "credit restricted felon" with

---

[5] The four kinds of criminal conduct raised by the prosecuting attorney were sexual intercourse, digital penetration, and the "deviate sexual conduct" of cunnilingus and fellatio. *Sentencing Tr*. at 11; *Appellant's App.* at 15-18.

respect to three of the Class A felony convictions: Count II, digital penetration; Count III, cunnilingus; and Count IV, fellatio.[6] "'Credit restricted felon' means a person who has been convicted of at least one (1) of the following offenses: (1) Child molesting involving sexual intercourse or deviate sexual conduct (IC 35-42-4-3(a)), if: (A) the offense is committed by a person at least twenty-one (21) years of age; and (B) the victim is less than twelve (12) years of age." Ind. Code § 35-41-1-5.5 (2008).[7] The State argued that Hogan, when over the age of twenty-one, repeatedly committed acts described in Counts II, III, and IV when A.B. was less than twelve years old. After taking the State's request under advisement, the trial court found that Hogan was a credit restricted felon with respect to Counts II, III, and IV. Hogan now appeals.

## DISCUSSION AND DECISION

### I. Inappropriate Sentence

"'This court has authority to revise a sentence 'if, after due consideration of the trial court's decision, the Court finds that the sentence is inappropriate in light of the nature of the offense and the character of the offender.'" *Spitler v. State*, 908 N.E.2d 694, 696 (Ind. Ct. App. 2009) (quoting Ind. Appellate Rule 7(B)), *trans. denied*. "Although Indiana Appellate Rule 7(B) does not require us to be 'extremely' deferential to a trial court's sentencing decision, we still must give due consideration to that decision." *Patterson v. State*, 909 N.E.2d 1058, 1062-63 (Ind. Ct. App. 2009) (quoting *Rutherford v. State*, 866

---

[6] The State did not request credit restricted felon status regarding the conviction for sexual intercourse, which happened when A.B. was older than twelve years of age.

[7] The predecessor to Indiana Code section 35-31.5-2-72.

11

N.E.2d 867, 873 (Ind. Ct. App. 2007)). We understand and recognize the unique perspective a trial court brings to its sentencing decisions. *Id*. at 1063. The defendant bears the burden of persuading this court that his sentence is inappropriate. *Id*.

Hogan argues that his 120-year executed sentence for four Class A felony convictions was inappropriate in light of the nature of the offenses and his character.[8] As to the nature of the offenses, he contends that he was not excessively brutal, did not use a weapon, nor did he threaten violence or physical injury. *Appellant's Br*. at 18. While admitting that "the victim was very young here and there was some evidence that feigned sexual acts were videotaped," Hogan contends, "A trial court should reserve the *maximum sentences* for classes of offenses that constitute the worst of the worst." *Appellant's Br*. at 18 (emphasis added).

We begin by noting that the trial court did not give Hogan the maximum sentence. Hogan was convicted of four Class A felonies, each of which allowed the imposition of a sentence ranging from twenty to fifty years, with the advisory sentence being thirty years. *See* Ind. Code § 35-50-2-4. Hogan could have been sentenced to 200 years without even factoring in the sentences for his four Class C felony and one Class D felony convictions.

Hogan repeatedly committed offenses against A.B. starting when she was five years old. By the time A.B. was ten or eleven, the nature of the offenses became more physical. When A.B. was ten or eleven years old, Hogan repeatedly handcuffed A.B. to the bed, tied A.B.'s legs together with a belt, and performed oral sex on her. Hogan also made A.B.

---

[8] Hogan was found guilty of nine felony offenses. However, because the sentences for the four Class C felony and one Class D felony convictions were ordered to be served concurrently with the sentences for the Class A felony convictions, we discuss only the nature of the Class A felony convictions.

stand on an exercise machine to enable oral sex, and forced her to sleep in his bed and perform oral sex on him. One time Hogan even poured hot water on A.B. when she would not sleep in his room. As part of the emotional abuse, Hogan would ceaselessly text and call A.B., whether she was in Florida, at school, or with friends. Two times he texted her that he had called the police on Father. A.B. testified that she loved Father and that, without him, she would be in foster care. *Tr.* at 176. Hogan threatened A.B. that if she told anyone, he would make it seem like it was A.B.'s fault. *Id.* at 175-76.

The nature of the offenses also reflect on Hogan's character. A.B. and Mother lived with Hogan from the time A.B. was two-and-a-half years old. Hogan was like a father to A.B. When A.B. was five, Hogan introduced her to the "chair game." *Id.* at 143, 144. When Hogan won the chair game, he could do anything he wanted to A.B. Hogan rigged the game so that he would win every time. Hogan, initially, was able to convince A.B. that sexual activity with a father figure was a normal part of everyday childhood. Even though A.B. had been exposed to outreach education at school, the routine of abuse conditioned A.B. to think that everything was fine. A.B. testified, "When I hit middle school everything like sixth grade was okay, nothing . . . like it wasn't okay but like it wasn't nothing big." *Tr.* at 150. Hogan had such control over A.B. that she could not understand that being subjected to oral sex at the age of five and thereafter should qualify as something "big." Hogan flooded A.B.'s life with messages of his inappropriate love for her and threatened that he would kill Father and send A.B. back to live with Mother, whom A.B. described as "a really bad mom." *Id.* at 175-76; *State's Ex.* 7. Hogan gave A.B. an "engagement ring," and told her that she would have his baby before she was seventeen years old. *Tr.* at 182.

Hogan's 120-year sentence was not inappropriate in light of the nature of the offense and the character of the offender.[9]

## II. Credit Restricted Felon

Hogan also contends that the trial court's application of the 2008 credit restricted felon ("CRF") designation to Counts II, III, and IV (digital penetration, cunnilingus, and fellatio, respectively), violated the constitutional prohibition against ex post facto laws.

> Among other things the ex post facto prohibition forbids the Congress and the States to enact any law which imposes a punishment for an act which was not punishable at the time it was committed; or imposes additional punishment to that then prescribed. The underlying purpose of the Ex Post Facto Clause is to give effect to the fundamental principle that persons have a right to fair warning of that conduct which will give rise to criminal penalties.

*Wallace v. State*, 905 N.E.2d 371, 377 (Ind. 2009) (citations omitted) (internal quotation marks omitted).

Pursuant to Indiana Code section 35-41-1-5.5 (2008),[10]a "credit restricted felon" is defined to include a person who has been convicted of child molesting involving sexual intercourse or sexual deviate conduct if the offender is at least twenty-one years old and

---

[9] Hogan also briefly claims that the trial court abused its discretion by ordering the thirty-year sentences for each of his Class A felony convictions to be served consecutively to each other. "A single aggravating circumstance may support the imposition of consecutive sentences." *Gellenbeck v. State*, 918 N.E.2d 706, 712 (Ind. Ct. App. 2009). The trial court found that Hogan occupied and abused a position of trust with respect to A.B. *Sentencing Tr.* at 16. Additionally, the trial court found that Hogan had *repeatedly* committed acts like those described in Counts II, III, and IV. We cannot say that the trial court abused its discretion in ordering the sentences for Hogan's Class A felony convictions to run consecutively to one another.

[10] The CRF designation was first enacted under Indiana Code section 35-41-1-5.5, which became effective July 1, 2008. This statute was repealed in 2012, and that same year the definition of credit restricted felon was recodified at Indiana Code section 35-31.5-2-72. A.B. turned twelve years old on June 15, 2011. CRF status requires the victim to be less than twelve years old; therefore, we refer only to Indiana Code section 35-41-1-5.5 (2008), which was in effect at the time A.B. was less than twelve years old.

14

the victim is less than twelve years old. *Gaby v. State*, 949 N.E.2d 870, 882 (Ind. Ct. App. 2011). "'A person who is a credit restricted felon and who is imprisoned for a crime or imprisoned awaiting trial or sentencing is initially assigned to Class IV.'" *Upton v. State*, 904 N.E.2d 700, 705 (Ind. Ct. App. 2009) (quoting Ind. Code § 35-50-6-4(b) (2008)), *trans. denied*. "'A person assigned to Class IV earns one (1) day of credit time for every six (6) days the person is imprisoned for a crime or confined awaiting trial or sentencing.'" *Id.* (quoting Ind. Code § 35-50-6-3(d) (2008)). The CRF statute was effective on July 1, 2008 and applies only to persons convicted after June 30, 2008. *Id.* at 704. In *Upton*, we concluded that retroactive application of the CRF statute to a defendant who committed an offense before the effective date of the statute, was an ex post facto violation even though the defendant was convicted after the effective date of the statute. *Id.* at 706.

Hogan argues that the record does not support that Counts II, III, and IV occurred after July 1, 2008, and, therefore, application of the CRF statute to those counts violates the ex post facto prohibition. He maintains that the charging informations "allege a broad timeframe during which Mr. Hogan's offenses were committed; specifically 'sometime during the period of time between the 15th of June, 2004 and the 31st of May, 2013.'" *Appellant's Br.* at 20 (quoting *Appellant's App.* at 15-23). Hogan contends that this "shotgun averment straddles the effective date of the statutory enactment," and "[u]nderstandably, the trial record is not clear as to whether the convictions for Counts II through IV occurred before or after July 1, 2008." *Appellant's Br.* at 20.

A.B. turned nine years old on June 15, 2008—two weeks before the effective date of the CRF statute. The State alleged that Hogan committed child molesting against A.B.

15

within a range of dates, some before and some after the effective date of the statute. A CRF designation for any crime committed prior to July 1, 2008, would, indeed, violate the ex post facto prohibition. Our Supreme Court, however, has held that even in the absence of a specific finding that an act of molesting occurred after the effective date of the CRF statute, a CRF designation does not violate the ex post facto prohibition if the evidence allows a reasonable jury to conclude that at least one incident of the charged conduct occurred after July 1, 2008. *See Sharp v. State*, 970 N.E.2d 647, 648 n.1 (Ind. 2012) (violation of ex post facto prohibition not explored where victim testified that defendant committed the act about "every other weekend," the last of which would have been after July 1, 2008). Here, while we agree that A.B. testified to some acts of deviate sexual conduct occurring prior to the effective date of the CRF statute, A.B.'s testimony also supported that Hogan committed at least one of each of the alleged acts after the effective date of the CRF statute and before A.B. turned twelve years old.

Count II alleged that Hogan committed child molesting by deviate sexual conduct, namely, "placing his finger inside the female sex organ of A.B." *Appellant's App.* at 16. A.B. testified that Hogan digitally penetrated her vagina before A.B., C.H., and their mother moved to Florida in May 2011. *Tr.* at 208. A.B. testified that before moving to Florida, when she was younger than twelve years old, Hogan touched her "[a]ll over. My vagina, my breasts, my butt, everything." *Id.* at 163. When asked whether Hogan touched the inside or outside of her vagina, A.B. testified that Hogan used his fingers to touch her vagina "[i]n and out." *Id.* This evidence allowed a reasonable jury to conclude that this deviate sexual conduct occurred after the effective date of the CRF statute and before A.B.

16

turned twelve years old on June 15, 2011.

Count III alleged that Hogan committed child molesting by deviate sexual conduct, namely, "placing his mouth on the female sex organ of A.B." *Appellant's App.* at 17. A.B. said that "it just all always happened" during the time Mother was packing to move to Florida. *Id.* A.B. testified that before she moved with Mother to Florida in May 2011, "oral sex would happen. He would make me do stuff to him. He would do stuff to me." *Tr.* at 162. This evidence, when viewed in light of A.B.'s testimony that Hogan placed his mouth on A.B.'s vagina when she was five years old and made her stand on an exercise machine for Hogan to commit cunnilingus on her after A.B. was twelve, allowed a reasonable jury to conclude that this deviate sexual conduct occurred after the effective date of the CRF statute and before A.B. turned twelve years old on June 15, 2011.

Count IV alleged that Hogan committed child molesting by deviate sexual conduct, namely, "placing his penis . . . in the mouth of A.B." *Appellant's App.* at 18. A.B. testified that while she lived in the house on Fifth Street, which would have been prior to her twelfth birthday, Hogan made her put her mouth on his penis. *Tr.* at 152. This evidence allowed a reasonable jury to conclude that this deviate sexual conduct occurred after the effective date of the CRF statute and before A.B. turned twelve years old on June 15, 2011.

We find no ex post facto violation in the trial court's determination that Counts II through IV are properly subject to the CRF statute. Based on the foregoing, we find no error in the trial court's sentencing of Hogan.

Affirmed.

FRIEDLANDER, J., and CRONE, J., concur.

17